

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2005 NOV 28 PM 1: 01
LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PATRICE SEGAR-GADEL

CIVIL ACTION

VERSUS

NO. 04-3213

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION

SECTION "S" (2)

## FINDINGS AND RECOMMENDATION

Plaintiff, Patrice Segar-Gadel, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Act. 42 U.S.C. §§ 405(g), 423. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).

As ordered, plaintiff filed a memorandum of facts and law. Record Doc. No. 16. Defendant filed a timely reply memorandum. Record Doc. No. 17.

Fee_____
Process_____
X  Dktd_____
✓  CtRmDep_____
   Doc. No _____

I.    PROCEDURAL HISTORY

Segar-Gadel filed an application for DIB on June 28, 2001, alleging disability since August 17, 1999 based on a dislocated right shoulder, torn rotator cuff and arthritis. (Tr. 92).  After plaintiff's application was denied, she requested a hearing before an Administrative Law Judge ("ALJ"), which was held on December 10, 2003.  On May 21, 2004, the ALJ denied plaintiff's application.  (Tr. 14-23).  After the Appeals Council denied review on September 24, 2004 (Tr. 4-6), the ALJ's decision became the final decision of the Commissioner for purposes of this court's review.

II.   STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.    The ALJ erred in finding that Segar-Gadel had engaged in substantial gainful activity between August 17, 1999 and April 4, 2000.

B.    The ALJ failed to apply the overwhelming medical evidence that plaintiff is disabled and failed to give proper weight to the medical reports of plaintiff's treating physician.

III.  ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1.    Plaintiff engaged in substantial gainful activity since the alleged onset of disability through April 4, 2000 but not thereafter.

2.    Segar-Gadel's status post dislocated right shoulder and arthritis in the right shoulder are severe impairments, which do not meet or

2

medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

3.      Plaintiff's allegations regarding her limitations and inability to work are not credible.

4.      Segar-Gadel has the residual functional capacity to perform work up to the light level of exertion only with the left hand and up to the sedentary level with the right hand, with no overhead work with the right dominant hand, such as reaching, pushing or pulling overhead; push and pull forward and downward with the right arm are limited to occasionally; no restrictions with the left upper extremity but limited to left extremity light exertion; no crawling or climbing ladders, scaffolds, ropes or at unprotected heights; avoid vibrating machinery affecting the right arm; and no extreme fingering or prolonged handling of more than sedentary objects with the right hand.

5.      Plaintiff's past relevant work as a customer service representative and a credit secretary did not require the performance of work-related activities precluded by her residual functional capacity.

6.      Her severe impairments do not prevent her from performing said past relevant work.

(Tr. 22-23).

## IV.   ANALYSIS

### A.   Standards of Review

The function of this court on judicial review is limited to determining whether there

is substantial evidence in the record to support the final decision of the Commissioner as

trier of fact and whether the Commissioner applied the appropriate legal standards in

evaluating the evidence.  Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 389 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Loza, 219 F.3d at 393; Spellman, 1 F.3d at 360.  This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence. Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990); Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

4

To be considered disabled and eligible for DIB, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2004). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. Id. §§ 404.1520, 416.920; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[1] The five-step

---

[1]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To

inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry. Newton, 209 F.3d at 453. If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Id.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history." Martinez, 64 F.3d at 174.

B.    Factual Background

Plaintiff testified that she was 47 years old, had graduated from high school and had attended two years of secretarial trade school but did not finish the program. She stated that she last worked from January 2000 until April 4, 2000, the day before she had

---

assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

surgery. (Tr. 30-31).  She explained that she had been a medical records puller and that, after she fell, she returned to work on light duty, sorting papers. (Tr. 31-32).  She said she had arthroscopy of her right shoulder on April 5, 2000 and did not return to work after that date.  Plaintiff testified that, as a medical records retriever, she would climb high ladders and pull files in a warehouse, which is how she fell.  She said that her light duty consisted only of putting papers in order and not doing any climbing.  (Tr. 32-33).

Segar-Gadel stated that she has had difficulties with her right arm and hand, but that her left hand is also causing problems now because she has been compensating for the right side.  (Tr. 31).

Plaintiff said that, before she worked as medical records retriever, she worked as a customer service representative at Kirschman's furniture store, answering customer telephone calls, ordering parts and scheduling repairs.  (Tr. 33).  She said the job consisted primarily of telephone work and using a computer terminal.  (Tr. 33-34).

Segar-Gadel testified that she worked as a secretary before she had the customer service job and that she owned an apartment cleaning business before that.  She stated that she dissolved the business because it was not making any money.  (Tr. 34-35).  She said she had worked as a housekeeper for Tonti Properties, an apartment complex, for a couple

of years before she went into business for herself. She stated that she cleaned corporate apartments for that company. (Tr. 36).

Plaintiff said that, when she left school, she worked as a credit secretary for two years, running credit reports and checking the credit of customers of the steel and aluminum company where she worked. (Tr. 37). She stated that she worked for Harland Industries, a check writing company, doing data entry for about a year until she was laid off. She recalled that she worked as a bus driver for two summers at Holy Cross summer camp and for a few months for the high school until she moved to a different parish. (Tr. 38-39). She said she also had a job bagging clothes and loading them into a truck for a dry cleaner.

Segar-Gadel testified that she could not work at any of her past jobs. She said she could not climb ladders, retrieve files from overhead or clean apartments because those jobs required too much use of her right arm. (Tr. 39). She said she is afraid to climb ladders and afraid of heights since she fell. (Tr. 39-40). Plaintiff stated that she does not think she can perform filing clerk duties because her left arm is also giving her trouble, because she is in a lot of pain and because, when she wears a brassiere, it cuts into her shoulder and makes her arm swell more than usual. She also testified that her medication makes her very drowsy most of the day so that she would not be of much use to an

employer and she would need someone to drive her to and from work. She stated that she is afraid to drive when she is on her medication.

Plaintiff said she had ulnar nerve surgery on her right elbow in September 2002 but she is still having pain from that nerve. She said her treating orthopedic surgeon, Raul Diaz, M.D., told her that the nerve was destroyed, perhaps because of waiting so long to do the surgery; that it might have been so stretched out that he was unable to repair it completely; and that he was thinking of sending her to another doctor to see if they could get the nerve to regenerate through another surgery. She said Dr. Diaz told her to think about that at her last visit with him on November 21, 2003. (Tr. 40-41). She stated that she never got any better after the ulnar nerve surgery. (Tr. 42).

Segar-Gadel testified that Dr. Diaz told her that physical therapy would only make her shoulder worse because the capsule is deteriorating from arthritis and when she moves it, she aggravates the arthritis. She said she can move her right arm but that, when she does so, it crunches, pops and is painful and she could not do any work that involved moving her right arm back and forth all day long. She stated that the pain in her right shoulder and right elbow is the main thing that prevents her from working. (Tr. 43).

Plaintiff further testified that her left shoulder is starting to pop and be painful as a result of compensating for her right shoulder, but it is not as bad as the right side. She

said she does not have a grinding or sticking pain in the left shoulder, as she does in the right, but that the left shoulder hurts when she moves it.  She said she is right-handed and that her right hand is very swollen, but she can move her fingers.  (Tr. 44).

Segar-Gadel stated that she would be able to type or use a keyboard for eight hours per day, but she would not be very fast because she would use only her left hand.  (Tr. 44-45).  She said she tries not to grip anything with her right hand but she could probably hold on to a small aluminum pot if it had nothing in it.  She said that sometimes her hand gives out when she picks up a cup of coffee.  She estimated she could pick up less than 10 pounds with her right hand.

Plaintiff testified that she has problems standing because her bra strap cuts into her right shoulder and makes her arm swell more.  She said that she also has problems standing because, when she relaxes her arm, it drops down, hurts and makes a clicking noise like it is dropping out because the muscles are so stretched out.  (Tr. 45).

Segar-Gadel said she sees Dr. Diaz once a month.  She stated that her condition has worsened since her shoulder surgery in 2000 because the pain has increased.  She said Dr. Diaz explained that the crunching, scratching and popping are the result of the capsule deteriorating.  (Tr. 46).  Plaintiff said that Dr. Diaz is waiting for approval from her worker's compensation insurer to do another arthroscopic surgery on her right shoulder.

She stated that she moves her right arm, shoulder and hand to keep them from getting frozen. She testified that it is very difficult to grip with her right hand and that she usually uses her left hand to pick up small items, such as change. She said her right elbow does not heal well, sometimes clicks or pops and is always swollen. She thought that the clicking and popping had increased since her ulnar nerve surgery. (Tr. 47-48).

Plaintiff testified that every day she takes extra-strength Vicodin, Neurontin, Bextra, Soma, Nexium for her stomach and Benadryl for itching. She said her medications make her extremely sleepy. She stated that she takes Neurontin three times a day, Vicodin four times a day or every six hours as needed, Bextra and Soma twice a day and Benadryl as needed. (Tr. 48-49). She said she takes a total of 1800 milligrams per day of Neurontin.

Segar-Gadel stated that about 20 minutes after taking her medication, she feels very drowsy and has to lie down for about an hour. She testified that she cleans her house but that it may take her 15 minutes some days or up to 60 minutes other days because she has to stop and rest. (Tr. 49). She said she typically lies down four or five times each day and has difficulty sleeping at night. She explained that the Neurontin gives her nightmares and that she has difficulty going back to sleep once she wakes up.

11

Plaintiff testified that she feels a throbbing pain in her right elbow. She said that she has her various pains most of the time but that the pains go away for a little while when she is on her medication. She stated that weather affects the pain. (Tr. 50). She testified that she has trouble concentrating because of the combined effects of the medication and the pain. For example, she said she forgets why she enters a room or forgets where she has put something and is just absent-minded, problems that she did not have before her injury in 1999. (Tr. 51).

Segar-Gadel said that, on a typical day, she takes her morning dose of medication, has coffee, unloads the dishwasher, sits in the recliner for a while until she feels better and can continue tidying up the house, walks outside some times during the day but eventually will either have to sit or lie down. (Tr. 51). She stated that she prepares most of the household meals for herself, her husband and her adult daughter. She testified that her daughter helps around the house.

Plaintiff testified that she will have another surgery for her elbow or arm if the worker's compensation insurer approves it. (Tr. 52).

C.   Vocational Expert Testimony

A vocational expert, Katrina Virden, testified that plaintiff's prior work as a file clerk in 2000 was sedentary and semi-skilled, while her prior job as a medical records

retriever was medium and semi-skilled.  She said that Segar-Gadel's previous jobs as a customer service representative, secretary and credit secretary were sedentary, semi-skilled jobs, while her bus driver job was light and semi-skilled.  Virden stated that delivery driver for a dry cleaner was a light to medium, unskilled job and that data entry clerk was sedentary and unskilled.  (Tr. 54).

The ALJ proposed a hypothetical of a younger individual with a high school education who has the exertional capacity for up to light work with the left hand and up to the sedentary level with the dominant right hand, restricted to no overhead work with the right arm and only occasional pushing and pulling forward and downward with the right arm, no contact with vibrating machinery with the right arm and no extended fingering or prolonged handling of more than sedentary objects with the right hand.  The ALJ placed no restrictions on the left arm other than the light exertional level and no limitations of the person's back or legs, except that she cannot crawl or climb ladders, scaffolds, ropes or at unprotected heights.  (Tr. 54-55).

Virden testified that such a claimant could perform plaintiff's past relevant work of a customer service representative or credit secretary as actually performed by plaintiff and as customarily performed in the national economy.  (Tr. 55-56).

13

The ALJ proposed a second hypothetical of an additional restriction in that the individual cannot concentrate and pay attention in performing even the simplest tasks, to the extent of being unable to complete those tasks. The vocational expert testified that such an individual would not be able to perform plaintiff's past relevant work as a customer service representative or credit secretary. (Tr. 56).

Upon cross-examination by plaintiff's attorney, Virden stated that she deleted the data entry clerk position as a possibility under the first hypothetical because of the ALJ's restriction against extended or prolonged fingering with the right hand. She said that such a restriction would not prevent a person from running credit reports, calling delinquent accounts and performing other sedentary telephone work, as described by Segar-Gadel in her descriptions of her credit secretary and customer service representative jobs. (Tr. 57).   Virden said that, in her opinion, dialing numbers on a telephone does not qualify as extended or prolonged fingering, while typing and keyboard entry do qualify. (Tr. 58).

Plaintiff's attorney proposed an additional hypothetical in which the claimant must lie down for approximately one hour four separate times during the day. The vocational expert said that such an individual would not be capable of performing any jobs. (Tr. 59).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence. (Tr. 15-19). I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

1.    *The ALJ erred in finding that Segar-Gadel had engaged in substantial gainful activity between August 17, 1999 and April 4, 2000.*

The ALJ found that Segar-Gadel "engaged in substantial gainful activity from her alleged onset date of August 17, 1999 through April 4, 2000 as evidenced by the Computational Earnings record (Ex. 2D) and claimant's testimony." (Tr. 15). Plaintiff argues that the ALJ erred in finding that her return to light duty as a file clerk from January 20, 2000 until April 4, 2000 was substantial gainful activity. The Commissioner has not responded to this argument.

Although Segar-Gadel did not specifically testify that she only worked four hours per day and four days per week beginning January 20, 2000, the remainder of the record demonstrates that she did not work from August 17, 1999 through January 20, 2000 because of her injury and subsequent surgery and that she only worked part-time from

15

January 20, 2000 through April 4, 2000, then had additional surgery on April 5, 2000. (Tr. 87, 92, 246).  A disability field examiner for the Commissioner found that this work constituted an unsuccessful attempt to return to work and did not qualify as substantial gainful activity.  (Tr. 87).

An unsuccessful work attempt is defined in the Commissioner's regulations as work that

> will <u>not</u> show that you are able to do substantial gainful activity if, after working for a period of 6 months or less, your impairment forced you to stop working or to reduce the amount of work you do so that your earnings from such work fall below the substantial gainful activity earnings level in paragraph (b)(2) of this section, and you meet the conditions described in paragraphs (c)(2), (3), (4), and (5), of this section.

20 C.F.R. § 404.1574(c)(1) (emphasis added).   Segar-Gadel meets the earnings requirement of Section 404.1574(b)(2) because her earnings in 2000 were only about one-half of what she earned in 1999.  (Tr. 86); 20 C.F.R. § 404.1574(b)(2) (earnings show substantial gainful activity if they average more than the amount earned the previous year).  She meets the requirements of paragraphs (c)(2) and (3)[2] because there was "a significant break in the continuity of [her] work" in that she was "out of work at least 30

---

[2]Subparagraphs (c)(4) and (5) are not applicable because Segar-Gadel did not work for more than three months.

consecutive days" and she worked less than three months because of her impairment. <u>Id.</u>

§ 404.1574(c)(2), (3).

The ALJ erred when he found that plaintiff had worked in substantial gainful activity from August 17, 1999 through April 4, 2000.  Rather, substantial evidence supports a finding that Segar-Gadel engaged in an unsuccessful work attempt from January 20 through April 4, 2000.  Accordingly, the correct alleged onset date for plaintiff's impairment is August 17, 1999.

> 2.    *The ALJ did not err by failing to apply the medical evidence and failing to give proper weight to the medical reports of plaintiff's treating physician.*

At the fourth step of the sequential evaluation, the ALJ found that plaintiff has the residual functional capacity to perform her past relevant work as either a customer service representative or a credit secretary.  Segar-Gadel argues that the ALJ failed to give proper weight to the medical reports, which she asserts contain overwhelming evidence of her disability, and specifically to the opinions of her treating physician, Dr. Diaz.

On his last progress note in the record, dated November 21, 2003, and for the first time in his years of treating plaintiff using the same progress note form, Dr. Diaz checked off a box at the bottom of his preprinted form, indicating that plaintiff is temporarily totally disabled.  (Tr. 391).  Although the ALJ summarized the November 21, 2003

treatment notes in his decision, he apparently did not notice, and in any event, did not mention, the check mark or opinion concerning disability at the bottom of Dr. Diaz's notes.

In addition, on April 29, 2003, Dr. Diaz completed an untitled form, which seems to have been prepared by a case manager for plaintiff's worker's compensation carrier, indicating his opinions concerning whether Segar-Gadel was capable of performing four specific jobs (unarmed security guard, hostess/cashier, ticket agent and greeter) that were being advertised as available in the New Orleans area in March 2003. For each position, Dr. Diaz checked off boxes indicating that plaintiff is not capable of performing the position as described, although he added that she could perform the security guard job if it was modified so that she would not be at risk for any confrontations or struggles with individuals. He did not explain his reasons for opining that she was unable to perform any of the other listed jobs. (Tr. 377-78). The ALJ did not address Dr. Diaz's opinions on this form.

It is well established that a physician's statement that a patient is disabled does not mean that the patient is disabled for purposes of the Act, because that is a determination that may be made only by the Commissioner. Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003); Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001).

18

> [S]ome opinions by physicians are not medical opinions, and as such have no "special significance" in the ALJ's determination.  Among the opinions by treating doctors that have no special significance are determinations that an applicant is "disabled" or "unable to work."  These determinations are legal conclusions that the regulation describes as "reserved to the Commissioner." . . .  The doctor's opinion [that plaintiff could not work] was not a medical opinion within the meaning of the regulation.

Frank, 326 F.3d at 620 (quoting 20 C.F.R. § 404.1527(e), (1) & (e)(3)).  Accordingly, the ALJ was not bound to accept the opinions of Dr. Diaz concerning plaintiff's alleged inability to work.

Although the opinion of a treating physician who is familiar with the claimant's impairments should be accorded great weight, a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight only if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.  Newton, 209 F.3d at 455.

Ultimately, the ALJ has sole responsibility for determining a claimant's disability status and is free to reject the opinion of any physician when the evidence supports a contrary conclusion.  "The opinions may be assigned little or no weight when good cause is shown.  Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is

unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." Id. at 455-56 (citations omitted).

In this case, substantial evidence supports the ALJ's decision not to accept the conclusory opinions of Dr. Diaz concerning plaintiff's ability to work. First, the progress note dated November 21, 2003 represents the first time in his three years of treating plaintiff that Dr. Diaz checked off a box at the bottom of his preprinted form, indicating that Segar-Gadel is temporarily totally disabled. No particularized explanation of functional limitations on plaintiff's ability to work or explanation of what has changed from the prior three years accompanies this check mark. (Tr. 391). Second, Dr. Diaz did not include any explanation or particularized limitations on the April 29, 2003 form on which he indicated that plaintiff could not perform any of the four jobs listed. Furthermore, he indicated that plaintiff could perform an unarmed security guard job if it was modified so that she would not be at risk for any confrontations or struggles. Thus, his opinion on November 21, 2003 that she was totally temporarily disabled conflicts with his opinion on April 29, 2003 that she could work as an unarmed security guard, as modified. Nor does Dr. Diaz give any explanation why Segar-Gadel could work as an unarmed security guard but could not perform any of the other positions listed on the April 29, 2003 form. (Tr. 377-78).

20

It is the province of the ALJ to resolve conflicts in the evidence. <u>Newton,</u> 209 F.3d at 452.  The record reveals that two examining physicians opined that Segar-Gadel's functional limitations would not prevent her from performing sedentary work.

On September 19, 2001, orthopedic surgeon, John E. McLachlan, M.D., examined plaintiff and took x-rays of her right shoulder.  His findings on physical examination and x-ray are accurately summarized in the ALJ's opinion.  Dr. McLachlan diagnosed mild shoulder arthritis, "old anterior shoulder dislocation, a pain syndrome, possibly dystrophy,[3] or persistent pain for unknown reasons." He did not think Segar-Gadel would need surgery in the near future and he found that her chronic pain was being managed with Vicodin. (Tr. 233).  He found that she had "considerable residual abilities [with] no difficulty sitting, standing, walking, hearing or speaking.  The patient will have difficulty lifting and carrying objects with the right hand.  It would appear to me that she should be able to write and use the right hand for desk level activities with minimal difficulty.  She has a good left upper extremity.  On this basis I feel that she can handle sedentary type deskwork" with restrictions against lifting, pushing, pulling, strenuous activity and

---

[3]Dystrophy refers to muscular dystrophy, "a group of degenerative myopathies characterized by weakness and atrophy of muscle without involvement of the nervous system." <u>Dorland's Illustrated Medical Dictionary</u> 560 (29th ed. 2000).

overhead work with the right arm.  He found no problems with her understanding, memory or social interaction.  (Tr. 234).

Segar-Gadel was examined by a consultative examiner, Camalyn W. Gaines, M.D., an internist, on April 3, 2003.  Dr. Gaines's findings are accurately summarized in the ALJ's opinion.  Dr. Gaines concluded that, despite moderately decreased range of motion in all planes of plaintiff's right shoulder, some residual sensory loss over the right ulnar nerve distribution and carpal tunnel syndrome on the right, plaintiff should be able to engage in sedentary activities, standing and walking, but should avoid lifting, pushing, pulling and overhead activities with her right arm.  (Tr. 364).

These opinions constitute substantial, conflicting evidence that Segar-Gadel can perform her past relevant work as a customer service representative and a credit secretary, both of which the vocational expert defined as sedentary positions.  If the court were the factfinder in the first instance, the court might have found that the weight of the evidence led to a different conclusion.  However, this court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's." Newton, 209 F.3d at 452.  As he is clearly entitled to do, the ALJ in this case weighed conflicting medical opinions and resolved the conflict in favor of rejecting the conclusory

restrictions by Dr. Diaz and accepting the limitations to sedentary work suggested by Drs. McLachlan and Gaines. Id.; Moore, 919 F.2d at 905.

## CONCLUSION

The ALJ erred when he found that plaintiff had worked in substantial gainful activity from August 17, 1999 through April 4, 2000. Rather, substantial evidence supports a finding that Segar-Gadel engaged in an unsuccessful work attempt from January 20 through April 4, 2000. Accordingly, the correct alleged onset date for her impairment is August 17, 1999.

The ALJ did not err by failing to apply the medical evidence or to give proper weight to the medical reports of plaintiff's treating physician. Substantial evidence in the record supports the ALJ's findings.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal

conclusions accepted by the district court, provided that the party has been served with

notice that such consequences will result from a failure to object.   Douglass v. United

Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).


New Orleans, Louisiana, this *28th* day of November, 2005.



JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE